UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | | |
|---|---|---|
| TRAVIS FUESLER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:25-cv-00004-TWP-KMB |
| | ) | |
| LAND OF INDIANA, INC., | ) | |
| LARRY W MORIN, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

This matter is before the Court on a Motion for Summary Judgment filed pursuant to Federal Rule of Civil Procedure 56 by Defendants Land of Indiana, Inc. ("Land of Indiana"), and Larry W. Morin ("Morin") (together, "Defendants") (Filing No. 52). Plaintiff Travis Fuesler ("Fuesler") initiated this action against his former employer, Land of Indiana, and its part-owner Morin under the Fair Labor Standards Act, 29 U.S.C. §§ 201–219 ("FLSA"), for failure to pay overtime wages and retaliation. For the reasons explained below, Defendants' Motion for Summary Judgment is **granted in part** and **denied in part**.

## I. BACKGROUND

The following facts are not necessarily objectively true, but as required by Federal Rule of Civil Procedure 56, the facts are presented in the light most favorable to Fuesler as the nonmoving party. *See Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

### A. Land of Indiana and Morin

Larry Morin founded Land of Indiana in 1993. He and his wife each own fifty percent of the company (Filing No. 63-1 at 10:18–11:7). Land of Indiana buys and sells land and prepares

and sells logs (Filing No. 52-5 at 11:8–13, 12:3–6; Filing No. 63-1 at 11:8–12:6, 14:23–15:6).[1] The company conducts its logging operations at a log yard in Bedford, Indiana, where Fuesler and Land of Indiana's other employees work.

Land of Indiana's employees do not do any work in the forests. They do not plant, tend, or cut down or fell trees, and they do not survey or cruise timber (Filing No. 63-2 at 29:6–22). Instead, Land of Indiana outsources logging work to contractors (and subcontractors), who cut the logs that are then sold to Land of Indiana (Filing No. 63-3 at 16:11–19, 18:22–19:8; Filing No. 63-2 at 13:5–10). Land of Indiana also outsources the transportation of logs from the forest to the log yard.

Once at the yard, the logs are separated, graded, and scaled for further sale to Land of Indiana's customers, which include lumber mills, pallet manufacturers, producers of wood veneer products, and several overseas companies (Filing No. 63-1 at 12:11–24; Filing No. 63-2 at 11:19–12:2, 14:4–16:17:8, 22:13–24:23). During the rescaling process, the logs and board footage are measured. Some logs are cut and trimmed in the rescaling process (Filing No. 63-3 at 19:4–8; Filing No. 63-2 at 16:13–23, 26:9–18). Logs are then marked or tagged and sorted using loaders, which are large forklifts used to move logs and to load and unload trucks (Filing No. 63-2 at 16:24–17:8, 19:23–20:8, 22:3–11). Land of Indiana does not saw or produce "lumber" at the yard. *Id.* at 63-2 19:3–12.

Co-owner Morin, controls Land of Indiana's finances and has the final say on all decisions made by the company (Filing No. 63-1 at 13:6–6–25). He has hiring authority but lets his grandson, Sylas Morin ("Sylas"), handle most of the hiring. *Id.* at 17:3–22. Morin also has firing authority,

[1] In his response, Fuesler asserts that several facts are "disputed" only insofar as he disputes whether these facts show: that the Forestry Exemption applies, that Morin is an "employer" under the FLSA; and that Fuesler's termination was retaliatory (Filing No. 62 at 12–13). However, these issues are questions of law, not fact. *Roe-Midgett v. CC Servs., Inc.*, 512 F.3d 865, 869 (7th Cir. 2008); *DaSilva v. Indiana*, 30 F.4th 671, 672 (7th Cir. 2022). The Court does not treat any fact as "disputed" merely because it is material to a legal issue.

but he has not used that authority and lets Sylas make those decisions. *Id.* at 19:13–17. Sylas has worked for Land of Indiana since July 2018. At first, Sylas helped prepare, scale, transport, procure, and sell logs, but sometime later (before Fuesler was hired), he took on a supervisory role. *Id.* at 18:17–19:8; (Filing No. 63-2 at 9:20–10:14). In his supervisory role, Sylas has hiring and firing authority (Filing No. 63-2 at 10:15–11:1).

Morin also decides what employees are paid and what their payroll period is, he personally writes employees' paychecks, and he decides the amount of leave days, vacation days, and holidays that employees are given (Filing No. 63-1 at 19:22–13). Morin decided that all Land of Indiana employees would be paid on a salary basis, and employees have always been hired on that basis (Filing No. 63-1 at 33:6–9; Filing No. 63-2 at 61:4–22). He also decided that Land of Indiana's employees would not be paid overtime because "they were paid salary, and . . . this work is . . . seasonal. . . . They worked every week, but some weeks they would be more busier [*sic*] than others." (Filing No. 63-1 at 34:7–35:1; Filing No. 63-1 at 34:17–35:1). Land of Indiana does not have an overtime policy (Filing No. 63-1 at 21:6–12).

**B. <u>Fuesler's Employment at Land of Indiana</u>**

In 2019, Fuesler wanted to inquire about a job with Land of Indiana, so he went to the log yard and waited for Morin to arrive (Filing No. 63-3 at 15:16–16:3). Once he did, Fuesler asked him if he was hiring. Morin said he was and directed Fuesler to speak with Sylas. Sylas believes that he and Morin "collectively" hired Fuesler (Filing No. 63-2 at 10:19–20). Sylas told Fuesler he would be paid $15.00 per hour but would not be paid overtime because employees "didn't really work overtime." (Filing No. 63-3 at 16:7–17:4). However, Morin was the one who decided that Fuesler would be paid $600.00 per week, on a salary basis (Filing No. 63-1 at 32:8–33:9).

Fuesler worked for Land of Indiana from 2019 to August 2024. At first, Sylas was Fuesler's supervisor, but around the summer of 2022, Land of Indiana hired Michael Sizemore ("Sizemore")

as a supervisor, and Sizemore began primarily supervising Fuesler. *Id.* at 22: 7–17, 30:9–20; (Filing No. 63-2 at 31:22–33:3).

While working for Land of Indiana, Fuesler operated chainsaws and a knuckle boom (Filing No. 63-2 at 20:9–20, 33:14–20). A knuckle boom is a type of crane that can lift logs and place them onto a bucksaw (a large chainsaw) to cut the logs. *Id.* at 20:9–18. Fuesler also cut logs to lengths, trimmed them, stapled them to prevent splitting, sorted them, and operated a loader to move logs and to load and unload trucks. *Id.* at 33:14–20, 47:5–15, 113:4–114:1. Fuesler learned how to operate a knuckle boom on the job, but he generally knew how to operate the other equipment before working for Land of Indiana (Filing No. 63-3 at 18:14–21). Fuesler did not plant, tend, care for, or cut or fell trees, and he did not survey or cruise timber. Fuesler's work did not require any forestry training. During the relevant time, Land of Indiana never employed more than eight people at the log yard. *Id.* at 21:13–15; (Filing No. 52-3 at 24 ¶ 5).

Fuesler was scheduled to work Monday through Friday, which is when Land of Indiana regularly operates (Filing No. 63-1 at 30:21–25; Filing No. 63-2 at 51:18–52:9). His and other employees' schedules were set by Sylas and/or Sizemore (Filing No. 63-1 at 22:4–11, 23:5–7, 31:2–7). Fuesler's start time was typically either 6:30 a.m. or 7:30 a.m., but the start time could have been later on certain days (Filing No. 63-3 at 20:19–23; Filing No. 63-2 at 52:17–53:10). Fuesler typically ended work around 4:30 p.m., although that was not always the case (Filing No. 63-3 at 20:21–23, 22:18–23). Land of Indiana had no set end time, and Fuesler did not work a set number of hours each day. *Id.* at 52:10–16, 56:12–15, 57:13–15. Employees worked until Sylas or Sizemore decided there was no more work to be done. *Id.* at 56:19–24.

Employees occasionally worked on Saturdays. *Id.* at 59:23–60:11. They were not paid overtime for those days because, according to Morin, "they were on salary and that was just extra

money that . . . [he] paid them." (Filing No. 63-1 at 36:5–17; Filing No. 63-1 at 36:9–17). Instead, Morin paid them a set amount of cash. Morin paid Fuesler $100.00 in cash for each Saturday he worked (Filing No. 63-3 at 26:23–25).

Land of Indiana operates all year and in all weather. While Fuesler worked there, some days or seasons were sometimes slower than others, but not by much. Whenever Fuesler worked fewer than forty hours in a week, it was only by two or three hours (Filing No. 63-3 at 28:1–6). Certain times were slower than others because inclement weather can affect the contractors' logging operations, meaning that fewer logs would be delivered to Land of Indiana's log yard for processing (Filing No. 63-2 at 54:3–55:21; Filing No. 63-1 at 35:2–13).

Land of Indiana does not have a timekeeping policy and did not implement a timekeeping system until late 2021 (Filing No. 63-3 at 22:24–23:3). In late 2021, Sylas purchased a cheap time clock from Amazon to keep track of employees' hours (Filing No. 63-3 at 23:9–11; Filing No. 63-2 at 64:13–20). Sylas started using the clock after a conversation with Fuesler about filling an open position at Land of Indiana.[2] Fuesler expressed concern that no one would want a salary position and claimed that employees were working forty-five hours per week (Filing No. 63-2 at 65:16–67:12. 79:5–9). Sylas testified that he bought the time clock "in case anybody ever wanted to change" to hourly pay, *id.* at 67:12–15, and to give himself "more insight" on the hours employees were working, *id.* at 72:5–17. Unfortunately, the time clock regularly malfunctioned, and Sylas found it difficult to download the timekeeping data from the clock to his computer. *Id.* at 74:11–20; (Filing No. 63-3 at 24:4–20). So, in early 2022, Land of Indiana stopped using the time clock.

[2] Fuesler testified that Sylas bought the time clock after employee Joseph Tolliver "said something," and that Fuesler was not a "part of that discussion." (Filing No. 63-3 at 22:24 –23:13). The Court nevertheless construes the evidence in the light most favorable to Fuesler at this stage.

For the rest of Fuesler's employment, Land of Indiana did not use any other electronic system for tracking its employees' work hours (Filing No. 63-2 at 76:10–14).

After Land of Indiana stopped using the clock, Fuesler started keeping handwritten records of his hours (Filing No. 63-3 at 24:25–25:2). Fuesler later tried to record his hours on his phone, but he found that process to be difficult, so he stopped. *Id.* at 25:19–21.

Around this same time, Sylas also started making daily handwritten notes of employees' hours. At the end of each week, Sylas put those notes into a weekly electronic "summation" and disposed of the notes (Filing No. 63-2 at 64:18–23). These summations show that for at least some weeks in 2022, 2023, and 2024, employees worked more than forty hours. *Id.* at 105:11–18. Sylas eventually instructed Sizemore to begin tracking employees' hours. *Id.* at 78:7–69:15.

**C. Fuesler's Alleged Complaints About Compensation**

Fuesler raised complaints about his hours and/or compensation on five occasions. The first occasion took place about a year after Fuesler began working for Land of Indiana. Morin discovered Fuesler's handwritten time records, and Fuesler told Morin that he had been working more than forty hours per week. Morin became "pretty mad" that Fuesler had been tracking his time, tore up the records, and told Fuesler he did not believe employees worked more than forty hours, even though only Sylas and Sizemore would know Fuesler's hours (Filing No. 63-3 at 29:15–30:11, 32:1–7, 38:19–39:23). Morin then asked Fuesler if he wanted to switch to hourly pay but that he would "have to cut [Fuesler's] hours if [he] chose to go that way." *Id.* at 30:14–20. Fuesler told Morin he "need[ed] to think about it." *Id.* at 30:14–19. Morin later spoke with Sylas about this conversation, and Sylas told Morin that employees were not working more than forty hours per week (Filing No. 63-1 at 42:12–20; Filing No. 63-2 at 139:12–21, 160:22–161:8).

The second complaint occurred about a year later. On this occasion, Fuesler asked Sylas if Land of Indiana's employees were exempt from overtime compensation. Sylas responded that

employees were not exempt, but that it was easier for the accountants if overtime compensation was not paid (Filing No. 63-3 at 32:11–23). Sylas offered to convert Fuesler's employment to hourly, but Fuesler rejected the offer (Filing No. 63-2 at 134:7–23). Some time after this exchange, Fuesler told Sylas that he was "burnt out" from working ten- to twelve-hour days, and Fuesler "begged him for an eight-hour day." (Filing No. 63-3 at 36:23–37:5). Sylas said he would "see what he can do" but suggested that Fuesler look for other employment. *Id.* at 27:6–11.

On a third occasion, around February 2024, Fuesler complained to Sylas that he was working more hours than he thought he should (Filing No. 63-2 at 132:2–25, 133:15–17). Fuesler also told Sylas that he "wasn't real happy" with Sizemore and complained that Sizemore "wasn't carrying his weight." *Id.* at 135:14–24. Sylas again offered to move Fuesler to hourly employment, but Fuesler did not accept the offer. *Id.* at 133:4–11.

Then, in early 2024, Fuesler filed a complaint with the United States Department of Labor about overtime compensation (Filing No. 63-3 at 43:10–13). The Department of Labor chose not to investigate. *Id.* at 43:14–44:6. Neither Morin nor Sylas knew about this complaint prior to Fuesler's termination (Filing No. 63-1 at 40:3–14; Filing No. 63-2 at 143:2–6).

The fifth time Fuesler allegedly complained was in text messages to Sylas shortly before his termination, as discussed immediately below.

**D. <u>Fuesler's Termination</u>**

Fuesler was terminated in August 2024. Sylas terminated Fuesler, although he "double-check[ed]" with Morin about the termination afterwards (Filing No. 63-2 at 10:25–11:1, 146:19–4; Filing No. 63-3 at 43:18–44:1). Sylas decided to terminate Fuesler during a conversation the two had, which was prompted by text messages from Fuesler stating that he was "burnt out" and "being targeted." (Filing No. 63-2 at 147:11–15, 149:3–5). After Sylas brought up the text messages, he started "going through . . . all the times that [Fuesler] didn't get along with coworkers"

and brought up Fuesler's "work ethic and his attitude towards his work." (Filing No. 63-3 at 148:3–5). In response, Fuesler reiterated that he was "burnt out." (Filing No. 63-2 at 148:3–17). Fuesler did not explain to Sylas what he meant by "burnt out." *Id.* at 148:18–21.

Sylas also brought up two earlier altercations involving Fuesler (Filing No. 63-3 at 147:23–148:3). The first was a dispute between Fuesler and former coworker Joseph Tolliver ("Tolliver") over firewood, which occurred several years earlier. *Id.* at 169:7–13. Sylas had told Fuesler and Tolliver that for logs not being sold to customers, they could keep whatever logs they split. Tolliver apparently wanted the wood that Fuesler had split, so he came to the yard one weekend and, using a Land of Indiana loader, put the wood in his vehicle and took it home. *Id.* at 39:8–40:8; (Filing No. 63-2 at 155:20–156:24). Fuesler called the sheriff's department and stated he was going to file charges against Tolliver (Filing No. 63-2 at 156:24–2). Tolliver was later terminated for using Land of Indiana's equipment without permission and without anyone else on site. *Id.* at 157:2–158:4.

The second altercation, which occurred just a couple weeks before Fuesler's termination, involved a logging contractor's employee, Nick Clifton ("Clifton"). *Id.* at 166:22–167:24. Clifton was calling Fuesler and his mom names, so Fuesler "responded in kind," and Clifton "ran up on" Fuesler (Filing No. 63-3 at 34:16–35:17; Filing No. 63-2 at 166:22–167:6). The altercation never became physical (Filing No. 63-3 at 36:6–10). Sylas did not discuss this altercation with Fuesler until the day of his termination (Filing No. 52-3 at 167:7–19).

By the end of their conversation, Sylas had decided that Fuesler should be terminated (Filing No. 63-2 at 148:12–17). Prior to his termination, Fuesler had never received any written discipline or been suspended, and Sylas had never complained to Fuesler about poor work performance. *Id.* at 152:12–18, 153:2–4; (Filing No. 63-3 at 36:20–22).[3]

[3] Sylas asserts he had discussed Fuesler's poor work performance with him before his termination (Filing No. 63-2 at 150:1–8, 152:22–24), but on summary judgment, the Court draws all reasonable inferences in favor of Fuesler.

On August 19, 2024, Land of Indiana hired Trey W. (last name unknown), who is another one of Morin's grandsons (Filing No. 63-2 at 111:12–20, 112:13–15). Trey is autistic, and Morin occasionally had Trey come to the yard to "hang out with the guys" and stay busy. *Id.* at 112:16–23, 114:2–5). Trey performed some of the work Fuesler did, including stapling and preparing logs and operating a loader. *Id.* at 12:24–113:7. Trey worked for Land of Indiana for about two months. After that, Land of Indiana did not hire anyone to replace Fuesler. *Id.* at 113:11–13, 114:2–11.

### E. Procedural History

Fuesler initially filed this lawsuit as a collective action, but he has since confirmed that this is now a single-plaintiff case (Filing No. 1; Filing No. 45). Fuesler asserts two claims under the FLSA: failure to pay overtime wages and retaliation. In February 2026, Defendants filed the instant Motion for Summary Judgment (Filing No. 52), which is now ripe for the Court's review.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 489–90 (7th Cir. 2007). In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in that party's favor." *Zerante*, 555 F.3d at 584 (citation omitted). "However, [i]nferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (citation modified) (alteration in original). Additionally, "a party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation modified).

"The opposing party cannot meet this burden with conclusory statements or speculation but only with appropriate citations to relevant admissible evidence." *Sink v. Knox Cnty. Hosp.*, 900 F. Supp. 1065, 1072 (S.D. Ind. 1995) (citations omitted).

"In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of [the] claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citation modified) (alteration in original). "Neither the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citation modified).

## III. DISCUSSION

As mentioned above, Fuesler asserts overtime and retaliation claims under the FLSA against Land of Indiana and Morin. In their summary judgment motion, Defendants contend that Fuesler's overtime claim must be dismissed because his work falls within a forestry work exemption to the FLSA's overtime provision. Defendants next argue that Fuesler's claims against Morin must be dismissed because Morin is not an "employer" under the FLSA. Defendants lastly argue that Fuesler's retaliation claim fails because he cannot establish a causal connection between his prior complaints and his termination. The Court addresses each argument in turn.

### A. The Forestry Exemption to Overtime Compensation

Among other things, the FLSA prohibits an employer from working his employees more than forty hours in a work week without compensating the employees overtime wages at a rate of at least time and a half for hours worked in excess of forty hours. 29 U.S.C. §§ 207, 215(a)(2). "Under the FLSA, employees are entitled to overtime pay . . . for any hours worked in excess of forty hours per week, unless they come within one of the various exemptions set forth in the Act."

*Schaefer–LaRose v. Eli Lilly & Co.*, 679 F.3d 560, 572 (7th Cir. 2012) (citing 29 U.S.C. §§ 207, 213).

Defendants argue that Fuesler's work falls within the FLSA's overtime exemption for forestry work (the "Forestry Exemption"), which states:

> The provisions of section 207 of this title shall not apply with respect to—
>
> (28) any employee employed in planting or tending trees, cruising, surveying, or felling timber, or in preparing or transporting logs or other forestry products to the mill, processing plant, railroad, or other transportation terminal, if the number of employees employed by his employer in such forestry or lumbering operations does not exceed eight;

29 U.S.C. § 213(b)(28). The application of an FLSA exemption is an affirmative defense, so Defendants bear the burden of proving that the Forestry Exemption applies. *Corning Glass Works v. Brennan*, 417 U.S. 188, 196 (1974); *Luna Vanegas v. Signet Builders, Inc.*, 46 F.4th 636, 641 (7th Cir. 2022) (citing 29 C.F.R. § 780.2). "Like all FLSA exemptions," the Forestry Exemption "must be 'narrowly construed against the employer seeking to assert [it]' and 'limited to those who come plainly and unmistakably within [its] terms and spirit.'" *Luna Vanegas*, 46 F.4th at 641 (alterations in original) (quoting 29 C.F.R. § 870.2).

The parties do not dispute that eight or fewer employees worked at Land of Indiana's log yard during the relevant time, and they agree that Fuesler was not "employed in planting or tending trees, cruising, surveying, or felling timber." 29 U.S.C. § 213(b)(28). They narrowly dispute whether Fuesler was "employed in . . . preparing or transporting logs or other forestry products to the mill, processing plant, railroad, or other transportation terminal." *Id.*

Defendants argue that Fuesler was engaged in preparing logs for their customers, including mills; but, according to Sylas, Land of Indiana itself is not a "mill" because it does not produce "lumber" (Filing No. 52-1 at 8–9). Fuesler responds that Land of Indiana *is* a "mill" under the

Forestry Exemption, and, more generally, Land of Indiana's log-processing operation does not fall within the scope of the Forestry Exemption (Filing No. 62 at 15–20).

The Court begins with the issue of whether Land of Indiana is a "mill" or a "processing plant"[4] under the Forestry Exemption. 29 U.S.C. § 213(b)(28). In construing statutory language, the Court begins with the statutory text. *Jimenez v. Quarterman*, 555 U.S. 113, 118 (2009) ("As with any question of statutory interpretation, our analysis begins with the plain language of the statute."). "Unless words are otherwise defined, they 'will be interpreted as taking their ordinary, contemporary, common meaning.'" *United States v. Melvin*, 948 F.3d 848, 852 (7th Cir. 2020) (quoting *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 227 (2014)). "We find words' ordinary, contemporary, common meaning by looking at what they meant when the statute was enacted, often by referencing contemporary dictionaries." *Id.* at 852. Sylas's personal understanding of what a "mill" is does not factor into the Court's analysis.

The Forestry Exemption was first added to the FLSA in 1949, and the phrase "preparing or transporting logs . . . to the mill, processing plant, railroad, or other transportation terminal," has not changed since then. Fair Labor Standards Amends. of 1949, ch. 736, § 11, 63 Stat. 1 (1949). The Court therefore looks to the common meaning of "mill" and "processing plant" as of 1949.

The 1947 edition of Webster's New International Dictionary defines "mill," in relevant part, as "Any of various machines which produce a manufactured product by the continuous repetition of some simple action; as, a saw*mill*; a stamp *mill*, etc." *Mill*, Webster's New International Dictionary (2d ed. 1947) (emphasis in original). The 1957 edition of Black's Law Dictionary gives a slightly narrower definition: "A complicated engine or machine for grinding and reducing to fine particles, fruit, or other substances, or for performing other operations by means of wheels and a

[4] Land of Indiana is plainly not a "railroad" or "transportation terminal," and neither party argues otherwise.

circular motion; also the building containing such machinery." *Mill*, Black's Law Dictionary (4th ed. 1957). Land of Indiana's operations do not fit the common meaning of "mill" as of 1949. Land of Indiana sorts, grades, and rough-cuts logs. By the end of this process, the logs are still closer to raw materials than "manufactured products" like planks, pallets, or veneers, which Land of Indiana's customers produce.

The term "processing plant," however, fits Land of Indiana's operations. The 1947 Webster's Dictionary defines "process," in relevant part, as: "To subject (esp. raw materials) to a process of manufacture, development, preparation for the market, etc.; to convert into marketable form." *Process*, Webster's New International Dictionary (2d ed. 1947). It defines "plant," in relevant part, as "The machinery, apparatus, fixtures, etc., employed in carrying on a trade or a mechanical or other industrial business." *Plant*, Webster's New International Dictionary (2d ed. 1947). The 1957 Black's Law Dictionary similarly defines a "plant" as "The fixtures, tools, machinery, and apparatus which are necessary to carry on a trade or business." *Plant*, Black's Law Dictionary (4th ed. 1957). A "processing plant," then, would have been commonly understood in 1949 to broadly refer to any machinery, business, or operation that prepares or develops materials into marketable goods. Land of Indiana does just that. It operates knuckle booms, loaders, and other machinery (*i.e.*, a "plant") to sort, mark, cut, and trim logs (*i.e.*, to "process") logs into marketable form. Based on the plain meaning of the Forestry Exemption, Fuesler's work was performed *at* a "processing plant," and not work in preparation "*to* the . . . processing plant." 29 U.S.C. § 213(b)(28) (emphasis added).

The Court also considers the phrase "such forestry or lumbering operations" in interpreting the Forestry Exemption. *See River Rd. Hotel Partners, LLC v. Amalgamated Bank*, 651 F.3d 642, 649 (7th Cir. 2011), *aff'd sub nom. RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S.

639 (2012) ("When interpreting statutory language, the meaning attributed to a phrase 'depends upon reading the whole statutory text, considering the purpose and context of the statute, and consulting any precedents or authorities that inform the analysis.'" (quoting *Kasten v. Saint–Gobain Performance Plastics Corp.*, 563 U.S. 1, 7 (2011))). The Forestry Exemption states that an employer must have no more than eight employees employed "in *such forestry or lumbering operations*." 29 U.S.C. § 213(b)(28) (emphasis added). Here, the pronoun "such" is used to refer to the antecedent phrase "planting or tending trees, cruising, surveying, or felling timber, or in preparing or transporting logs or other forestry products to the mill, processing plant, railroad, or other transportation terminal," meaning that the Forestry Exemption considers these operations to be "forestry or lumbering operations." *Nielsen v. Preap*, 586 U.S. 392, 407–08 (2019) ("Because '[w]ords are to be given the meaning that proper grammar and usage would assign them,' the 'rules of grammar govern' statutory interpretation 'unless they contradict legislative intent or purpose.'" (alteration in original) (citation omitted) (quoting A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 140 (2012))). In determining the meaning of "forestry or lumbering operations," the Court again refers to the 1947 Webster's Dictionary, which defines "forestry" as "The science and art of forming, caring for, or cultivating forests; the management of growing timber"; and defines "lumbering" as "The business of cutting or getting timber or logs from the forest for lumber." *Lumbering*, Webster's New International Dictionary (2d ed. 1947). Fuesler's work did not involve the growth or cultivation of timber, nor did it relate to cutting or acquiring timber from the forest, so it was plainly not "forestry or lumbering operations" and did not fall within the Forestry Exemption.

A third textual clue confirms the Court's conclusion. Defendants argue that Fuesler's work falls within the Forestry Exemption because he prepares logs for Land of Indiana's customers,

which include mills and other processing plants, but the Forestry Exemption refers to work preparing and transporting logs to "*the* mill," not "a" mill. 29 U.S.C. § 213(b)(28) (emphasis added). Congress's use of the definite article "the" indicates that it intended for the Forestry Exemption to no longer apply once the logs or forestry products reach their first "mill, processing plant, railroad, or other transportation terminal." *See Nielsen*, 586 U.S. at 408 ("Grammar and usage establish that 'the' is a function word . . . indicat[ing] that a following noun or noun equivalent is definite . . . ." (alteration and omission in original) (citation modified)); *Am. Bus Ass'n v. Slater*, 231 F.3d 1, 4–5 (D.C. Cir. 2000) ("[I]t is a rule of law well established that the definite article 'the' particularizes the subject which it precedes."). The Forestry Exemption therefore does not apply to an intermediary, like Land of Indiana, that is itself a "mill, processing plant, railroad, or other transportation terminal" that passes logs and forestry products onto other such operations.

Based on the plain and unambiguous language of the Forestry Exemption, Land of Indiana's operations at the log yard were not exempt from the FLSA's overtime requirements. However, even if the Court were to find ambiguity in this language and look to its legislative history, that history would only further support Fuesler's position.

The Fifth Circuit helpfully summarized the purpose and intent of the Forestry Exemption in *Gatlin v. Mitchell*, 287 F.2d 76 (5th Cir. 1961):

> The restriction of the exemption to employers who employ not exceeding twelve [as originally enacted] employees in forestry or lumbering operations was intended to make it applicable only to the small *migratory* lumber milling operations peculiar to the Southeast- called "peckerwood mills." "They cut scrap timber that would not be economical for the larger mills to cut * * *. Many of them go out and hire farm boys in the immediate vicinity of the mill * * *. It is an added source of income to these *small-farm people. They are the type of sawmill which is covered by the exemption*." (Emphasis added.) The language of the exemption should be construed, so far as it reasonably can be, to carry out that intention.
>
> The legislative history makes it quite clear that forest operations **up to the time the logs or products enter the sawmill, processing plant, or transportation terminal** are encompassed by the language of the exemption. Here, the rationale

> was that such work can be performed only under favorable weather conditions. The terms of the exemption are carefully phrased to carry out the intention expressed by the legislative history. . . . The nouns "trees," "timber," "logs," "other forestry products," **trace the life of the tree** from its inception to its end **and one step toward its conversion** into lumber or paper. The verbs correspondingly follow the **tree's** growth and use.

*Id.* at 78–79 (bold emphasis added) (footnotes omitted). This legislative history shows that the Forestry Exemption was intended to apply to work related to the life of a tree and its first step toward conversion into a product. Land of Indiana, while certainly not the last step in production, is at best the second step and was therefore not intended to fall within the Forestry Exemption.

In their summary judgment motion, Defendants argue that because the Forestry Exemption was intended to apply to "work [that] can be performed only under favorable weather conditions," companies that operate outdoors, like Land of Indiana, should fall within the Exemption. *Id.* at 78. The Court disagrees. As Morin and Sylas explained in their depositions, Land of Indiana's operations are not affected by the weather. Rather, the *loggers* are affected by the weather. Land of Indiana is only affected to the extent that the weather might mean that the loggers deliver fewer logs for Land of Indiana to process (Filing No. 63-2 at 54:7–55:21; Filing No. 63-1 at 35:2–9). But Land of Indiana's work can be done regardless of the weather. According to Fuesler's undisputed testimony, Land of Indiana was busy every season, and even slow weeks for Land of Indiana were thirty-seven to thirty-eight hour weeks (Filing No. 63-3 at 21:3–7, 28:1–6). The fact that Land of Indiana's log yard is outdoors is not enough to bring it within the Forestry Exemption.

The parties also cite various Department of Labor interpretive bulletins related to the Forestry Exemption, although they dispute the deference the Court should give those regulations (Filing No. 52-1 at 7 –9; Filing No. 62 at 18–24). The Court defers to these agency interpretations "only to the extent that the interpretation[s] ha[ve] the power to persuade." *U.S. Dep't of Labor v. N.C. Growers Ass'n*, 377 F.3d 345, 353 –54 (4th Cir. 2004) (citing *Skidmore v. Swift & Co.*, 323

U.S. 134 (1944)). The weight of the bulletins "'depend[s] upon the thoroughness evident in [the agency's] consideration, the validity of [the agency's] reasoning, its consistency with earlier and later pronouncements, and all those factors which give it the power to persuade.'" *Id.* at 354 (alterations in original) (quoting *Skidmore*, 323 U.S. at 140). The Fourth Circuit Court of Appeals has explained that the Department of Labor forestry exemption bulletins are not entitled to *Skidmore* deference because they do not explain the agency's conclusions. *Id.* at 354. This Court tends to agree with the Fourth Circuit. But even if the Court were persuaded by the bulletins, they would not change the Court's conclusion, as they only further support a finding that Fuesler's work—processing logs after the trees have already been felled and transported out of the woods—is not the type of work intended to fall under the Forestry Exemption. *See* 29 C.F.R. § 788.8 ("[T]he usual members of a crew *which go to the woods* for the purpose of felling timber and preparing and transporting logs are engaged in operations described in the exemption." (emphasis added)); 29 C.F.R. § 788.9 ("Preparing logs includes, where appropriate, removing the limbs and top, cutting them into lengths, removing the bark, and splitting or facing them *when done at the felling site*, but does not include such operations when done at a mill. Employees engaged in sawmill, tie mill, and other operations *in connection with the processing of logs*, such as the production of lumber, *are not exempt*." (emphases added)); 29 C.F.R. § 788.11 ("[A]ny other loading, transportation, or other activities performed in connection with the logs or other forestry products *after they have been unloaded at one of the described destinations* is not exempt.").

As a final matter, the Court addresses both parties' arguments about the scope of the Forestry Exemption. According to Defendants, Fuesler would have the Court narrowly limit the Forestry Exemption to work done in the forest or at the "felling site." (Filing No. 52-2 at 8–9). According to Fuesler, Defendants would have the Court broadly apply the Forestry Exemption to

"all middle suppliers in the supply chain." (Filing No. 62 at 18). The Court need not, and does not, define the outer limits of the Forestry Exemption. The Court is only determining whether, based on the summary judgment record, the work done at Land of Indiana's log yard is exempt.

Based on the undisputed material facts, and construing the Forestry Exception narrowly against Defendants, the Court concludes that Defendants have failed to show its employees "come plainly and unmistakably within [the Forestry Exemption's] terms and spirit.'" *Luna Vanegas*, 46 F.4th at 641. Accordingly, summary judgment on Fuesler's overtime claim is **denied**.

**B. Morin as an "Employer" under the FLSA**

Defendants next argue that Fuesler's claims against Morin must be dismissed because Fuesler cannot show that Morin is an "employer" under the FLSA. The FLSA defines "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). A person is an "employer" under the FLSA if (1) that person had supervisory authority over the plaintiff-employee; and (2) that person was responsible in whole or in part for the violation. *Riordan v. Kempiners*, 831 F.2d 690, 694 (7th Cir. 1987). "The Supreme Court has instructed the courts to construe the terms 'employee' and 'employer' expansively under the FLSA." *Vanskike v. Peters*, 974 F.2d 806, 807 (7th Cir. 1992) (citation omitted); *see Bradley v. Hiway Trucking, LLC*, No. No. 24-cv-922, 2026 WL 2172457, at *3 (S.D. Ind. Feb. 9, 2026) ("These definitions are 'both broad and circular' for a reason. They are designed to reach new kinds of employment relationships so that our economy does not suffer from the 'social ills caused by low pay and long hours.'" (quoting *Brant v. Schneider Nat'l, Inc.*, 43 F.4th 656, 664–65 (7th Cir. 2022))). The definition of "employer" is broad enough to encompass another employee, provided that the other employee "had supervisory authority over the [plaintiff] and was responsible in whole or part for the alleged violation." *Riordan*, 831 F.2d at 694.

To determine whether a defendant qualifies as an "employer," the Seventh Circuit uses a multi-factor test focused on the "economic realities" of the parties' relationship and control over the plaintiff's work. The relevant factors include:

> (1) the extent of the employer's control and supervision over the employee; (2) the kind of occupation and nature of skill required, including whether skills were acquired on the job; (3) the employer's responsibility for the costs of operation; (4) the method and form of payment and benefits; and (5) the length of the job commitment.

*Love v. JP Cullen & Sons, Inc.*, 779 F.3d 697, 702 (7th Cir. 2015) (citing *Knight v. United Farm Bureau Mut. Ins. Co.*, 950 F.2d 377, 378–79 (7th Cir. 1991)). The first factor—control and supervision—is the most important. *Bronson v. Ann & Robert H. Lurie Children's Hosp. of Chi.*, 69 F.4th 437, 448–49 (citing *Love*, 779 F.3d at 702–03). This factor generally accounts for the defendant's "control over the result of the work" and "the details by which it is achieved," but "key powers evincing control are the right to hire and fire the plaintiff." *Bronson*, 69 F.4th at 449.

Even if a defendant does not exercise control over the plaintiff as a general matter, he may qualify as an "employer" if he exercises "control over the specific aspects of [the plaintiff's] employment related to the subject of his suit." *Tamayo v. Blagojevich*, 526 F.3d 1074, 1088–89 (7th Cir. 2008); *Bronson*, 69 F.4th at 450 (citing *Tamayo*, 526 F.3d at 1088–89; *Harris v. Allen Cnty. Bd. of Comm'rs*, 890 F.3d 680, 684, 686 (7th Cir. 2018); and *Love*, 779 F.3d at 706). "In short, 'it is generally control over the decisions which may cause a violation of the FLSA which equates to a duty and potential liability as an employer.'" *Duvall v. Heart of CarDon, LLC*, 611 F. Supp. 3d 607, 632 (S.D. In. 2020) (quoting *White v. Classic Dining Acquisition Corp.*, No. 11-cv-712, 2012 WL 1252589, at *3 (Apr. 13, 2012)); *see also Davis v. B & S, Inc.*, 38 F. Supp. 2d 707, 715 (N.D. Ind. 1998) ("The ultimate question facing the Court in the 'economic reality' inquiry is whether the individual had control over the alleged FLSA violation.").

Here, Morin certainly had general control over Land of Indiana and its employees. He owns fifty percent of Land of Indiana (his wife owning the other fifty percent) and controls all of Land of Indiana's decisions, financial or otherwise. *See Donovan v. Grim Hotel Co.*, 747 F.2d 966, 972 (5th Cir. 1984) (affirming partial summary judgment as to liability and permanent injunction in favor of plaintiffs; "[The individual defendant] has held [the companies'] purse-strings and guided their policies. It was only he who could authorize compliance with the Fair Labor Standards Act. He personally selected the manager of every hotel. . . .The hotels were part of the [defendant's] family business. In short, the hotels, speaking pragmatically, were [the defendant's] and functioned for the profit of his family."); *Villareal v. El Chile, Inc.*, 776 F. Supp. 2d 778, 786 (N.D. Ill. 2011) ("[W]e recognize that courts have held that financial control over a corporation is a significant factor in determining whether an individual meets the statutory definition of an employer.").

Morin also had the authority to hire and fire employees, and even though he generally delegated those decisions to Sylas, he is the one who hired Sylas. *See Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999) ("[T]he fact that he hired individuals who were in charge of the [other employees] is a strong indication of control."). Morin also hired Fuesler (or at least participated in the hiring), and though he did not terminate Fuesler, Sylas "double-checked" with him after the fact. *Braddock v. Madison County*, 34 F. Supp. 2d 1098, 1107 (S.D. Ind. 1998) ("The defendant's control over the relevant aspects of employment need not be exclusive.").

Morin did not set employees' hours and left that decision up to Sylas and Sizemore, but Morin still had control over the alleged FLSA overtime violation at issue. Morin decided that all employees would be hired on a salary basis, that they would be paid weekly, what their payroll period would be, and what their weekly pay would be. Morin also decided that Land of Indiana

would not have an overtime policy and, despite not keeping track of employees' hours, he decided that employees would not be paid overtime. Morin also wrote all of the employees' checks.

In sum, while Morin did not typically exercise his hiring and firing authority and did not set employees' hours, he maintained exclusive control over the decisions that caused the alleged overtime violation. *See Solis v. Int'l Detective & Protective Serv., Ltd.*, 819 F. Supp. 2d 740 (N.D. Ill. 2011) (finding that individual defendant was "employer," where defendant "was the president and sole owner of [the company] and was responsible for payroll, accounting, and invoicing" and "[h]e also signed the paychecks and controlled all of [the company's] corporate activities"); *Villareal*, 776 F. Supp. 2d at 787 (making the "close call" to deny plaintiff's motion for summary judgment; "While it is difficult to believe that . . . the sole owners of businesses that generated gross sales between $1,400,000 and $2,200,000 . . . , with absolute control of the purse strings, the power to hire and fire the managers of the restaurants, and the authors of a directive that employees not be scheduled to work overtime hours, completely delegated to others the actual operation of the businesses and the supervision of employees as they now contend, the Court cannot determine as a matter of law that the individual defendants' position is so incredible as to warrant disregarding it as a matter of law." (internal citation omitted)).

Based on the undisputed material facts, a reasonable jury could find that Morin was an "employer" under the FLSA. Accordingly, summary judgment as to Fuesler's claims against Morin is **denied**.

## C. <u>Fuesler's Retaliation Claim</u>

Fuesler's second claim is that Defendants terminated him in retaliation for his complaints about not receiving overtime pay. The FLSA makes it unlawful "to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to [the FLSA]." 29 U.S.C.A.

§ 215(a)(3). "To state a retaliation claim under this provision, a plaintiff must plausibly allege that he engaged in activity protected under the Act, his employer took an adverse employment action against him, and a causal link exists between the two." *Sloan v. Am. Brain Tumor Ass'n*, 901 F.3d 891, 894 (7th Cir. 2018).

Oral complaints may constitute protected activity under the FLSA if they "provide 'fair notice' that an employee is asserting his rights under the FLSA." *Kasten v. Saint-Gobain Performance Plastics Corp.*, 703 F.3d 966, 968 (7th Cir. 2012). "To fall within the scope of the antiretaliation provision, a complaint must be sufficiently clear and detailed for a reasonable employer to understand it, in light of both content and context, as an assertion of rights protected by the statute and a call for their protection." *Katsen v. Saint-Gobain Performance Plastics Corp.*, 563 at 1, 14 (citation modified). The "fair notice" standard is objective. *Id.* The employer need not have actual knowledge that the plaintiff is asserting rights under the FLSA "so long as a reasonable employer in [the defendant's] circumstances and armed with its knowledge of the relevant context would have had fair notice of his assertion of rights protected by the FLSA." *Id.* at 976.

Here, Fuesler made five complaints: (1) an oral complaint to Morin sometime between 2019 and 2021; (2) an oral complaint to Sylas a year later, along with comments about being "burnt out" and wanting "an eight-hour day"; (3) an oral complaint to Sylas in February 2024 about working more hours than he wanted to; (4) a Department of Labor complaint in early 2024; and (5) text messages to Sylas about being "targeted" and "burnt out" shortly before his termination.

Defendants initially argue that the Department of Labor complaint does not suggest retaliation because neither Morin nor Sylas knew about it before Fuesler's termination (Filing No. 52-1 at 11). Absent any response from Fuesler on this issue, the Court agrees. That leaves Fuesler's oral and text message complaints to Morin and Sylas as evidence of retaliation.

Defendants argue that even assuming[5] that Fuesler's oral complaints to Morin and Sylas between 2019 and 2022, and in early 2024, they are too remote in time to show a causal connection between those complaints and Fuesler's termination (Filing No. 52-1 at 11). The Court agrees. "[F]or there to exist a telling temporal sequence, the employer's adverse action should follow fairly soon after the employee's protected expression." *Horwitz v. Bd. of Educ.*, 260 F.3d 602, 613 (7th Cir. 2001). "[T]iming may offer a clue to causation (or its absence) when an employee charges retaliation: a short gap may suggest a causal link, while a long one undercuts an inference of causation." *McGuire v. City of Springfield*, 280 F.3d 794, 796 (7th Cir. 2002). In his response, Fuesler describes these oral complaints as establishing an "ongoing wage dispute with Company management," but his complaints were too few and far between, and too temporally disconnected from his retaliation, to suggest retaliation (Filing No. 62 at 28).

The only alleged complaint close to the time of Fuesler's termination was his text message complaint to Sylas that he was "burnt out" and "being targeted." (Filing No. 63-2 at 147:11–15, 149:3–5). But these text message excerpts are not sufficient to reasonably notify Defendants that Fuesler was asserting his FLSA rights. Being "burnt out" from a job may not necessarily refer to work hours, or even more specifically to weekly work hours in excess of forty hours. It could also refer to being "burnt out" after working a job for several years, or with difficult coworkers, or after doing strenuous work for fewer than forty hours per week, among other possibilities. The phrase "being targeted" is likewise too vague to invoke the FLSA's overtime protections. A reasonable employer could think an employee is "being targeted" for performance issues, workplace violations, employee-on-employee disputes, or for any number of other reasons. In his response,

[5] For purposes of summary judgment, Defendants do not dispute that Fuesler's oral complaints were sufficient to reasonably notify Defendants that he was asserting his rights under the FLSA. The Court therefore need not address Fuesler's argument as to why his oral complaints were sufficient (Filing No. 62 at 27).

Fuesler explains that he felt "burnt out" because he was working ten to twelve hour days, but he did not provide this explanation to Sylas (Filing No. 63-2 at 148:3–21), and he does not explain how his own understanding of his text messages is sufficient to put a reasonable employer in Land of Indiana's position on notice that he was exercising his FLSA rights. The court cannot say Fuesler's texts about being "burnt out" and "targeted" are sufficiently clear or detailed for a reasonable employer to understand them to be an assertion of FLSA rights.

Additionally, Fuesler has failed to raise a genuine dispute as to whether the proffered reasons for his termination are pretextual. Sylas testified that he decided to terminate Fuesler based on several considerations, including Fuesler's work being "subpar," which Fuesler attributed to being "burnt out," Fuesler's inability to get along with coworkers, and his prior altercations with a former coworker and a contractor. In support of his claim that these reasons are pretextual, Fuesler notes that Sylas never previously raised issues of Fuesler's work performance or Fuesler not getting along with his coworkers, and that the two altercations occurred weeks or years prior to his termination. However, Fuesler's deposition testimony shows that the proffered reasons for his termination have merit, which belies Fuesler's claim of pretext.

Fuesler testified that Sylas never raised any performance issues or issued formal discipline to Fuesler prior to his termination, but there is no evidence from Fuesler that he was performing adequate work, and Sylas explained during his deposition that he does not issue written discipline because Land of Indiana's employees are "all grown adults" and "can communicate a problem and see how . . . they react to it." (Filing No. 63-2 at 152:12–18). Additionally, Fuesler admitted that "[t]here were days" when he and his coworkers would pick on each other and "gripe" about each other (Filing No. 63-3 at 33:9–34:5). Fuesler had also previously complained that he thought other coworkers were being treated better than him, particularly with respect to lunch breaks and

vacation days (Filing No. 63-3 at 37:15–38:10; Filing No. 63-2 at 63:22–25, 137:24–138:6). Further, Fuesler does not dispute that he engaged in the altercation with former employee Tolliver years earlier, or the altercation with contractor Clifton two weeks prior.

Fuesler lastly argues that the quick hiring of Morin's grandson, Trey W., also shows that his termination was pretextual (Filing No. 62 at 29), but he fails to explain how the hiring of a family member shows pretext or retaliation. Further, there is undisputed testimony from Sylas that Trey is autistic and was regularly hired on short-term bases to perform some work, interact with employees, and stay busy. The fact that Trey only worked for Land of Indiana for about two months, and that Land of Indiana never filled Fuesler's position thereafter, also cuts against Fuesler's argument that his termination was a pretextual.

Based on the totality of the evidence, no reasonable jury could find that Fuesler's termination was caused by his protected activity. Even accepting all of Fuesler's evidence as true and drawing all reasonable inferences in his favor, his tenuous evidence of suspicious timing and vague references to being "targeted" and "burnt out" does not create a genuine dispute of material fact as to unlawful intent, particularly where ample and undisputed evidence demonstrates a clear causal connection between Land of Indiana's proffered reasons and Fuesler's termination. Defendants' Motion for Summary Judgment as to the retaliation claim is therefore **granted**.

## IV. CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment (Filing No. 52) is **GRANTED in part** and **DENIED in part**. Summary judgment is **GRANTED** as to Fuesler's retaliation claim, which is **dismissed with prejudice**. Summary judgment is **DENIED** as to Fuesler's overtime wage claims against Land of Indiana and Morin. These claims **shall proceed** to trial or settlement. This matter remains set for a final pretrial conference on January 20, 2027, and a jury trial beginning February 22, 2027.

The Magistrate Judge is requested to contact the parties schedule a settlement conference.

**SO ORDERED**.

Date: September 23, 2026

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

Distribution:

Robert Adam Hicks
Hicks Swanson
rhicks@maceylaw.com

David Arthur Smith
MCINTYRE & SMITH
dsmith@smithlawbedford.com

Michelle D. Wyrick
Bricker Graydon Wyatt LLP
michellewyrick@bricker.com

Courtesy Copy: Magistrate Judge Kellie M. Barr
Magistrate Judge Van Willis
(Completed by CRD)